IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:20-CR-43-TAV-HBG |
| BREANNA GARTH, | ) | |
| ANTHONY D. BROWN, and | ) | |
| DONAVON M. RUFFIN, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

This case is before the Court, for report and recommendation, on the Defendants' Motion to Dismiss Indictment [Doc. 59] and Motion to Suppress [Doc. 61].  *See* 28 U.S.C. § 636(b).  The Defendants ask the Court to determine whether the odor of marijuana still provides probable cause to search an automobile and whether all the occupants of a car constructively possess the illegal drugs in the trunk.  The undersigned respectfully finds that law remains unchanged on the former and the latter turns on the facts of the case.

On April 7, 2020, Tennessee Highway Patrol ("THP") Trooper Jeffrey Clowers stopped a Nissan Sentra for speeding and failure to maintain its lane of travel.  Defendant Breanna Garth was driving, Defendant Anthony Brown was seated in the front passenger's seat, and Defendant Donavon Ruffin was in the backseat.  As Trooper Clowers approached the car, he noticed the odor of marijuana.  Trooper Clowers obtained a driver's license from Garth and conducted a records check, learning that Garth's driver's license was invalid.   Seven minutes after Trooper Clowers stopped the car, a back-up officer arrived.  The occupants of the car were subsequently removed and detained, and the officers searched the car, finding eight packages of methamphetamine in a

plastic grocery bag against the back wall of the trunk. The Defendants argue that Trooper Clowers lacked probable cause or reasonable suspicion to conduct the traffic stop, that the warrantless search of the car violated their rights under the Fourth Amendment, and that the trooper unreasonably detained them beyond the beyond the time necessary to conduct the traffic stop. Defendants Brown and Ruffin also ask the Court to dismiss the Indictment, because the Government cannot prove, as a matter of law, that they constructively possessed the methamphetamine in the trunk.

For the reasons discussed herein, the Court finds that Trooper Clowers had probable cause to stop the Sentra, after observing traffic violations. The Court also finds that Trooper Clowers had probable cause to search the vehicle for drugs based upon the odor of raw marijuana coming from the vehicle. Additionally, the Court finds that Trooper Clowers could delay the search for a brief time while awaiting the arrival of another officer for officer safety and that the detention of the Defendants until the search of the Sentra was reasonable. Finally, the Court finds that whether the passengers in the car actually or constructively possessed the illegal drugs in the trunk turns upon the facts of the case and, as such, is a matter for the jury. Accordingly, the undersigned respectfully recommends that both motions be denied.

## I.    POSTIONS OF THE PARTIES

This case arises out of the April 7, 2020 stop and search of a Nissan Sentra, driven by Defendant Garth and containing Defendants Brown and Ruffin as passengers. Based upon evidence seized from the car on that day, the three Defendants are charged with conspiracy to possess fifty or more grams of methamphetamine with intent to distribute (Count One) and

possession of fifty grams or more of methamphetamine with intent to distribute (Count Two) [Doc. 36].[1]

The Defendants[2] ask [Docs. 61, 72, 73, & 75] the Court to suppress all evidence gained from the April 7, 2020 traffic stop, arguing that the trooper's actions violated their rights under the Fourth Amendment. They contend that the traffic stop was an unconstitutional seizure, because Trooper Clowers lacked probable cause to believe they were speeding or that they endangered other drivers by moving out of their lane of travel. Second, the Defendants argue that the odor of marijuana did not provide probable cause to search the car, because the odor of marijuana cannot be distinguished from the odor of lawful substances, such as hemp. Third, they assert that Trooper Clowers prolonged the stop beyond its lawful purpose and scope.

The Government responds [Docs. 64 & 77] that the stop and search of the car in which the Defendants were traveling was lawful. It contends that Trooper Clowers properly stopped the Sentra for speeding and failing to travel within its lane. The Government argues that Trooper Clowers had probable cause to search the Sentra, because he detected the odor of marijuana coming from inside the car. It also maintains the stop was reasonable in scope and duration.

Defendants Brown and Ruffin[3] ask [Doc. 59] the Court to dismiss the Indictment. They argue that taking the facts as alleged in the Criminal Complaint as true, the Government cannot prove that they actually or constructively possessed the methamphetamine in the trunk. They

---

[1] The Defendants were originally charged by criminal complaint on April 8, 2020 [Doc. 1].

[2] The Motion to Suppress [Doc. 61] was filed by Defendant Garth and joined by Defendants Ruffin [Doc. 62] and Brown [Doc. 63]. The Court granted the Defendants' motions to join at the October 6, 2020 evidentiary hearing [Doc. 70].

[3] The Court granted Defendant Ruffin's motion to adopt [Doc. 62] Defendant Brown's Motion to Dismiss Indictment at the October 6, 2020 evidentiary hearing [Doc. 70].

3

contend that constructive possession requires power over the item or intent to exercise dominion over the item and cannot be inferred from a person's mere physical proximity. Defendant Brown states that he was seated in the front passenger's seat with no direct physical control over the drugs, nor was he the owner, driver, or renter of the car.

The Government responds [Doc. 65] that the Defendants raise issues of fact, rather than issues of law, and, thus, the issue of constructive possession cannot be determined pretrial. It contends that circumstantial evidence shows the Defendants constructively and jointly possessed or aided and abetted in the possession of methamphetamine in the trunk. The Government maintains that this is not a case in which the Defendants' only connection to the methamphetamine is their presence in the car. It asserts that Defendant Ruffin rented the car, and that Defendant Brown's duffle bag was in the trunk near the methamphetamine. It asserts that all three Defendants lied to Trooper Clowers about the purpose of their trip and their relationship to each other. Finally, it states it will present testimony at trial that drug trafficking organizations often send trusted men to protect large drug shipments. The Government also argues that the Defendants' challenge goes only to the possession count and does not address the conspiracy count, which does not require possession as an element of the offense.

The Court held an evidentiary hearing on the suppression motion on October 6, 2020. Assistant United States Attorney Kevin Quencer appeared on behalf of the Government. The following defense counsel also appeared: Attorney Robert White representing Defendant Garth, Attorneys A. Philip Lomonaco and Jordan Brinkman representing Defendant Brown, and Attorney Ursula Bailey representing Defendant Ruffin. All three Defendants were also present. The Government presented the testimony of Trooper Clowers. The Court granted defense counsel's request to file post-hearing briefs.

Defendants Garth [Doc. 72] and Ruffin [Doc. 72] filed post-hearing briefs on October 23, 2020. Defendant Ruffin also manually filed a flash drive containing a video recording not previously entered in evidence [Doc. 74]. Defendant Brown filed a post-hearing brief on October 26, 2020 [Doc. 75]. On November 3, 2020, the Government responded [Doc. 78] to the Defendants' post-hearing briefs, asking the Court to reopen the evidentiary hearing to permit Trooper Clowers to respond to the seeming discrepancy between his testimony about the time of the stop and the video's depiction of the arrival of the back-up officer. The Court found good cause to reopen the evidentiary hearing to permit identification and authentication of the video recording and to permit the Government to present evidence in response to the video recording [Doc. 78].

The parties appeared for the reopened evidentiary hearing on December 7, 2020. AUSA Quencer again represented the Government. Attorneys White, Lomonaco and Brinkman, and Bailey appeared on behalf of Defendants Garth, Brown, and Ruffin, respectively. All three Defendants were again in attendance. The Government presented additional testimony by Trooper Clowers and the parties stipulated to the video exhibit. Following the arguments of counsel, the Court took the suppression motion under advisement.

## II. SUMMARY OF TESTIMONY

The Government presented the testimony of THP Trooper Jeffrey Clowers, who testified that he has worked for the THP for approximately two years and makes between twenty-five and thirty traffic stops daily [Tr. at 7].[4] On April 7, 2020, Trooper Clowers was working in Anderson County, Tennessee, when he observed a Nissan Sentra [Tr. at 7-8, ]. He saw the Sentra cross over

---

[4] The transcript [Doc. 71] of the October 6, 2020 evidentiary hearing was filed on October 20, 2020.

5

the right fog line twice [Tr. at 8]. Trooper Clowers "paced" the Sentra by matching the speed of the Sentra with his patrol car and determined that the Sentra was traveling at seventy-five (75) miles per hour in a sixty-five-mile-per-hour zone [Tr. at 8]. Trooper Clowers then stopped the Sentra [Tr. at 8].

Trooper Clowers testified that he approached the Sentra on the passenger's side [Tr. at 8]. The occupants rolled down the window, and Trooper Clowers smelled marijuana coming from the car [Tr. at 8-9]. Trooper Clowers stated that he is familiar with the odor of marijuana [Tr. at 9]. He testified that Breanna Garth was in the driver's seat, Anthony Brown was in the front passenger's seat, and Donovan Ruffin was sitting in the backseat behind the driver [Tr. at 9]. Trooper Clowers said he told Garth that he stopped her for speeding and failure to maintain a lane, and he asked for her driver's license [Tr. at 9]. Garth produced her license, and Trooper Clowers asked her to get out of the car and stand between her car and the patrol car [Tr. at 9-10]. Garth was not handcuffed [Tr. at 10]. Trooper Clowers checked Garth's driver's license and learned that it was suspended [Tr. at 10]. He asked where she was going, and Garth told him that she was going to visit her mother in Tennessee for two weeks [Tr. at 10]. Trooper Clowers said Garth seemed nervous and could not tell him her mother's address [Tr. at 10-11].

Trooper Clowers testified that he next went to the front passenger to get the car's registration and to check the Vehicle Identification Number ("VIN") [Tr. at 11]. Trooper Clowers asked the front passenger the reason for their trip, and Brown replied that they were coming from Detroit and going to Texas Street, Drive, or Avenue in Knoxville, Tennessee, to take Garth's daughter, who was ill, to the hospital [Tr. at 11]. Brown said they would then return to Detroit [Tr. at 11]. Trooper Clowers stated that based upon his experience with the THP, he knew Detroit, Michigan, is a source city for drugs [Tr. at 12]. He said that as he talked with Brown, he noticed

6

a large pint-sized prescription bottle of cough syrup [Tr. at 13]. Trooper Clowers asked Brown about the prescription bottle, and Brown told him he bought it "off the street" and had been mixing it with a drink and drinking it [Tr. at 13]. Trooper Clowers said that he could not read the label on the bottle, but he knew prescription cough syrup contains controlled substances like codeine [Tr. at 13-14].

Trooper Clowers stated that he also spoke with Ruffin, who said, consistent with Brown, that the purpose of the trip was to pick up a young woman, take her to the hospital, and return [Tr. at 14]. He stated that Ruffin said he knew Garth because she was Brown's girlfriend. Trooper Clowers could not remember how Brown said he knew Garth but he recalled that it conflicted with Ruffin's explanation of the relationship [Tr. at 15].

Trooper Clowers said he eventually searched the car and found "shake," which is small bits of marijuana, mashed into the carpet [Tr. at 15]. He said he found a duffle bag containing a hookah in the backseat [Tr. at 15]. He also seized the prescription bottle of cough syrup from the backseat [Tr. at 15]. In the trunk, Trooper Clowers found two duffle bags, one containing female clothing and the other containing male clothing [Tr. at 15]. In the back right side of the trunk, he found eight vacuum-sealed packages containing a clear crystal substance, which he believed was methamphetamine [Tr. at 16]. The eight packages, which together weighed eight pounds, were in two doubled-bagged brown plastic grocery bags [Tr. at 16]. Trooper Clowers said other than the two duffle bags and the plastic bags, the trunk was clean and appeared to be new [Tr. at 16]. Based upon a check of the license tag, Trooper Clowers learned the Sentra was a rental car, but he received this information after talking with the occupants [Tr. at 17]. He said Garth told him the car was rented by her aunt, but he later learned it was rented by Ruffin [Tr. at 17]. Trooper Clowers

7

said based on information from other officers, he knows the price of a kilogram of methamphetamine is around $5,000 [Tr. at 17].

On cross-examination by Attorney White, Trooper Clowers testified that he was traveling on Interstate 75 south in the same direction as the Nissan Sentra, when he noticed the car [Tr. at 18]. He said he followed the Sentra for one mile before turning on his blue lights and stopping it [Tr. at 18]. Trooper Clowers said the Sentra crossed over the fog line twice in one-quarter mile. At that point, Trooper Clowers was close enough to read the license tag and report the numbers to the dispatcher [Tr. at 19]. While calling the dispatcher, Trooper Clowers also noticed the Sentra was speeding [Tr. at 19]. Trooper Clowers said it was dark and around 21:15 or 9:15 p.m., when he noticed the Sentra [Tr. at 19]. He did not recall seeing any other traffic in the area [Tr. at 19]. Trooper Clowers said he was approximately two hundred yards behind the Sentra and his headlights illuminated both the vehicle and the fog line [Tr. at 20]. He agreed that the entire tire of the Sentra passed over the fog line on both occasions [Tr. at 21]. Trooper Clowers paced the Sentra for about one-quarter mile [Tr. at 21].

Trooper Clowers said when he went to the front passenger's side of the Sentra, he instantly noticed the odor of raw marijuana [Tr. at 22-23]. He said he could distinguish the odor of raw marijuana from that of burnt marijuana [Tr. at 23]. Trooper Clowers said the marijuana shake from the floorboard was not tested, because there was not enough to test [Tr. at 23]. He stated the shake in the floorboard was the only marijuana found in the car [Tr. at 23]. Law enforcement searched the three Defendants and did not find marijuana on their persons [Tr. at 23-24]. Trooper Clowers testified that it is legal to possess hemp in Tennessee with the proper permit [Tr. at 24]. He said although he has heard that the odor of hemp is not distinguishable from that of marijuana,

he did not know from personal experience, because he was not familiar with the odor of hemp [Tr. at 24].

Trooper Clowers testified that Garth was the first occupant to get out of the car [Tr. at 24]. He said she handed him her driver's license before she got out [Tr. at 25]. He stated that at some point in the stop, he checked the driver's licenses of the passengers [Tr. at 25]. Trooper Clowers did not recall whether Ruffin had a valid driver's license [Tr. at 25]. Trooper Clowers said he believed Garth was nervous because she "would freeze up" in response to his questions and some of her answers were not responsive to his questions [Tr. at 25-26].

Trooper Clowers stated that after other officers arrived on the scene, he got Brown and Ruffin out of the car [Tr. at 27-28]. He said another officer pointed out items in the backseat [Tr. at 27]. Trooper Clowers said he looked through the window and saw a duffle bag on the backseat and a bottle of cough syrup behind the duffle bag [Tr. at 27]. Trooper Clowers stated he could tell the bottle was a "medication-type bottle," and he asked Brown about it [Tr. at 27]. Brown replied that it was a bottle of cough syrup, which Brown had bought off the street [Tr. at 27]. Brown also said they had been mixing it [Tr. at 27]. Trooper Clowers said he noticed the bottle of cough syrup fifteen to twenty-five minutes after stopping the Sentra [Tr. at 28].

Trooper Clowers said the duffle bag on the backseat contained a hookah, which is a device for vaping or smoking and is not illegal [Tr. at 30]. He said in addition to the cough syrup and the marijuana shake, he also found a discolored lemonade drink in the passenger compartment [Tr. at 30]. He stated that he unzipped and searched inside the two duffle bags in the trunk to determine they contained male and female clothing [Tr. at 31]. Trooper Clowers said the methamphetamine in the trunk was inside two brown plastic grocery bags located in the back of the trunk against the wall separating the trunk from the backseat [Tr. at 31]. He said once the brown plastic bag was

9

moved away from the wall, he could see the contents of the bag without opening it, because the packages of the crystal substance were overflowing the bag [Tr. at 32-33]. He said the crystal substance did not have an odor [Tr. at 33]. Trooper Clowers said that although his patrol car is equipped with a video camera, his camera system was not working at the time of the traffic stop in this case [Tr. at 28-29].

Upon cross-examination by Attorney Bailey, Trooper Clowers testified that he began the THP academy on January 28, 2018, and was commissioned on June 15, 2018 [Tr. at 33]. He started "road work" on July 2, 2018, approximately one and one-half years before the instant traffic stop. [Tr. at 33-34]. He stated that during this time, he has made more than 2,000 traffic stops and found drugs more than sixty (60) times [Tr. at 34]. He said it would have been difficult to get a patrol car with a working camera system at the time of the stop [Tr. at 34]. He confirmed that he called for the license plate check as he was pacing the Sentra but did not tell the dispatcher that he was pacing the car [Tr. at 34]. Trooper Clowers said he told the dispatcher he was making a traffic stop on the Sentra [Tr. at 35]. Trooper Clowers stated that he followed the Sentra for one mile before observing it cross the fog line twice [Tr. at 35].

Trooper Clowers stated that after stopping the car, he introduced himself and told the occupants that he stopped them for speeding and failure to maintain a lane [Tr. at 36]. He said upon his first contact with the occupants, he smelled raw marijuana [Tr. at 36]. He stated that after he returned Garth to the car, he asked her about marijuana, which she denied [Tr. at 36-37]. He said the marijuana shake was found in the passenger's side floorboard [Tr. at 37]. He said he first saw the cough syrup from the rear door window on the passenger's side [Tr. at 38]. The bottle was lying on its side between a duffle bag and the seat, and he could tell that it was a medical

bottle with writing [Tr. at 38]. Trooper Clowers asked Brown about the bottle, and Brown told him it was cough syrup [Tr. at 38].

Trooper Clowers said after he spoke with the driver and both passengers, he searched the car [Tr. at 38]. He said he searched the car because he smelled marijuana, he saw the medicine bottle, and Brown told him it was cough syrup, which he had bought off the street and had been mixing with a drink [Tr. at 38-39]. He said he did not advise the occupants of the *Miranda* warnings before asking questions about the cough syrup bottle [Tr. at 39]. He agreed he was investigating at this time but said he had not determined he would arrest the occupants [Tr. at 39]. He stated that he sometimes gives a citation for possession of marijuana if the amount is under one-half ounce [Tr. at 40].

Trooper Clowers said that the other officers arrived fifteen to twenty-five minutes after he stopped the Sentra [Tr. at 40]. He said he did not ask the occupants for the rental agreement [Tr. at 40]. He also did not ask whether the other occupants had a valid driver's license, after learning Garth's driver's license was invalid [Tr. at 40]. He said his department requires two officers to be present for a search and, before he takes multiple people out of a car, he wants another officer on the scene [Tr. at 41]. Trooper Clowers said he did not intend to search the car when he stopped it but decided to search, after he smelled marijuana and had conflicting stories from the occupants [Tr. at 41]. He said that Garth told him she was going to visit her mother for two weeks, while Brown said they were returning to Detroit, after they took Garth's daughter to the hospital [Tr. at 41-42]. He could not recall whether Garth said all three occupants were staying with her mother for two weeks or just her [Tr. at 42].

On cross-examination by Attorney Brinkman, Trooper Clowers testified that the marijuana shake was embedded in the carpet and was not collected [Tr. at 43]. He said that Brown was still

11

seated in the car when he asked Brown about the purpose of their trip [Tr. at 43-44]. Brown said they were en route to a street in Knoxville named Texas, but Brown did not know if it was Avenue, Road, or Drive. Trooper Clowers said Brown said he was from Detroit. Trooper Clowers agreed that Texas Avenue is a street in North Knoxville and that the Sentra was stopped about twenty miles north of Knoxville [Tr. at 44]. He agreed it was possible that the trio was traveling to Texas Avenue [Tr. at 45].

Trooper Clowers said he did not use a radar in assessing the speed of the Sentra [Tr. at 45]. He said there was no traffic around at the time he encountered the Sentra [Tr. at 45-46]. He agreed that until he searched the trunk, he was not aware of any illegal evidence in the trunk [Tr. at 46]. He agreed there were two duffle bags in the trunk and three occupants in the car [Tr. at 46]. He agreed that Brown was not the one who rented the Sentra [Tr. at 47].

On redirect examination, Trooper Clowers agreed none of the occupants mentioned having a permit to transport hemp, nor did they mention a commercial hemp enterprise [Tr. at 47]. He agreed that nothing about the car or the behavior of the occupants caused him to believe that they were involved in a commercial hemp business [Tr. at 48]. He said Garth told him that the purpose of the trip was to visit her mother for two weeks [Tr. at 48]. Trooper Clowers agreed that Garth did not know her mother's address, but the passengers knew the street name [Tr. at 48]. He also said when Brown discussed the purpose of the trip, Ruffin was sitting three feet away from him in the back seat [Tr. at 48-49]. Trooper Clowers agreed it was possible that Ruffin could have heard Brown's explanation [Tr. at 49]. He said at the time he asked Brown about the purpose of the trip, the radio was not on and the engine was quiet [Tr. at 49-50].

Trooper Clowers said that while speaking with Garth, he asked for consent to search the car [Tr. at 50]. Garth responded that she had a license and insurance, so why would he want to

12

search [Tr. at 50]. Trooper Clowers said he told her he thought the car contained contraband but Garth gave the same response [Tr. at 50]. Trooper Clowers characterized Garth's answers as unresponsive to his questions and said they made him think that Garth was nervous [Tr. at 50]. Trooper Clowers agreed that he was familiar with people who are calm and people who are nervous during a traffic stop [Tr. at 50-51]. Trooper Clowers agreed that when he decided to search the Sentra, he knew the following: He smelled marijuana at the door of the car, the occupants' stories did not make sense, the driver had an invalid driver's license, the driver seemed nervous, the driver did not know her mother's address, he saw a bottle for prescription medicine in the back seat, Brown told him the bottle contained cough syrup that he bought off the street, and the occupants said they were traveling from Detroit [Tr. at 51-52].

On recross-examination by Mr. White, Trooper Clowers testified that he learned Garth had an invalid driver's license three to four minutes after stopping the Sentra and ten to twenty minutes before the other officers arrived [Tr. at 52]. He agreed there was sufficient time before the other officers arrived for him to write a citation for driving on a suspended license, speeding, and failure to maintain a lane [Tr. at 52-53].

On recross-examination by Ms. Bailey, Trooper Clowers agreed that Garth's responses to his questions did not make sense to him [Tr. at 53]. He said that although Brown said he bought the cough syrup, Ruffin was sitting closer to it [Tr. at 54]. He said he did not know whether Ruffin had any connection to the cough syrup or the shake [Tr. at 54].

On recross-examination by Mr. Lomonaco, Trooper Clowers testified that at the time of the stop, he did not know if it was illegal for the occupants to possess the cough syrup without a prescription [Tr. at 55]. Trooper Clowers said Brown said they were mixing the cough syrup with another drink, and he found a Minute Maid lemonade in the passenger's door, which the occupants

13

could have been drinking [Tr. at 55-57]. He said even if it is not illegal for the occupants to possess the cough syrup, it is problematic for them to mix it with another beverage and drink it [Tr. at 56]. He said Brown told him they had been mixing the cough syrup and "sipping it," but he did not see the lemonade until he searched the car [Tr. at 56-57]. Trooper Clowers said the driver did not appear to be under the influence of an intoxicant [Tr. at 56].

The Court reopened the evidentiary hearing on December 7, 2020,[5] and the Government recalled Trooper Clowers, who said that when he previously testified that he stopped the Nissan Sentra at approximately 9:16 p.m., he meant 9:16 p.m., Central Time, which is 10:16 Eastern Time. Trooper Clowers stated that he is positive about the time of the stop. He said that in his report on the stop,[6] he gave two times: 10:16 p.m., Eastern Time, and 21:16, which is 9:16 p.m, Central Time. He said the CAD system in this patrol car is on Central Time, which could be the reason for him stating that he conducted the stop around 9:00 p.m., Central Time, in the narrative of his report. He stated that the CAD system is the dispatcher's log of the events of the stop. He acknowledged that the top of his report stated that the stop occurred at 10:16 p.m., but in the narrative, he mistakenly stated the time as Central Time. Trooper Clowers testified that ten to fifteen minutes elapsed between stopping the Sentra and the arrival of another officer.

On cross-examination by Ms. Bailey, Trooper Clowers acknowledged that he did not say he was referring to Central Time in his previous testimony that the stop occurred around 9:00 p.m. He stated that the THP headquarters is in Nashville, Tennessee. He said the dispatcher is based out of Knoxville but operates on Central Time. He agreed that the designation of Central Time

---

[5] A court reporter was not available for the December 7, 2020 evidentiary hearing, but the parties agreed that the hearing would be recorded.

[6] A copy of Trooper Clowers's report was not introduced into evidence or shown to the Court.

was not on any documents in the case. He said that Deputy Laxton was the next officer on the scene, after him. He agreed that the video recording from Deputy Laxton's patrol car did not have sound, only video. Trooper Clowers said ten to fifteen minutes elapsed from the stop of the Sentra to Deputy Laxton's arrival. During this time, Trooper Clowers said he interviewed the occupants, checked Garth's driver's license, tried to locate the rental agreement, and smelled marijuana. He said also during this time the occupants of the car gave differing stories about the purpose of the trip. Trooper Clowers stated that he was waiting for another officer to arrive, because he smelled marijuana. He stated that he had probable cause to detain the occupants, because he smelled raw marijuana as soon as he arrived at the passenger's window. He agreed that there was no laboratory report for marijuana from the stop and that he did not find enough marijuana to test.

On cross-examination by Mr. Lomonaco, Trooper Clowers testified that the THP's CAD, or computer dispatch system, runs on Central Time statewide. He said he notified the dispatcher to call for back up, and they called the Anderson County Sheriff's Department, because the stop was in Anderson County. He said he did not hear the dispatcher call for the back-up officer, but he received a notification that the back-up officer was en route.

Trooper Clowers said Trooper Fletcher took a photograph of the marijuana on the floorboard. No samples of the marijuana were collected to Trooper Clowers's knowledge. He said his patrol car is equipped with a camera, but it was not working that day. Trooper Clowers said he is a "road trooper" and that did not conduct any other drug stops or searches that day. Trooper Clowers agreed that when he learned there was a bottle of cough syrup, he detained the occupants. He said once the bottle was removed from the vehicle, he knew it was illegal to have the cough syrup, which contained promethazine, without a prescription.

The parties stipulated to the video recording from Deputy Laxton's patrol car [Doc. 74].

The video begins with a date stamp of April 7, 2020, and a time stamp of 22:21:07 or 10:21 p.m.[7]

Deputy Laxton is driving. At 22:23:35 or shortly after 10:23 p.m., Deputy Laxton parks his patrol

car behind Trooper Clowers's patrol car, which is a Sport Utility Vehicle ("SUV"). At 22:29:42,

Trooper Clowers gets Ruffin out of the Sentra on the driver's side and walks with him to a point

between patrol cars. Trooper Clowers talks with Ruffin for five minutes before directing Ruffin

to stand beside the passenger's side of Trooper Clower's patrol car. At 21:41:02, Deputy Laxton,

who is standing beside his patrol car, gestures to someone behind his patrol car, suggesting that

other officers have arrived on the scene. Trooper Clowers handcuffs Ruffin and puts him in the

back of his patrol car at 22:48:24. Deputy Laxton directs Brown, whose hands are handcuffed

behind him, past and presumably into his patrol car at 22:50:52. At 22:51:46, Deputy Laxton

directs Garth to stand in front of Trooper Clowers's patrol car. By 22:54:28, Trooper Clowers is

searching the Sentra.

## III.    FINDINGS OF FACT

Based upon the testimony of Trooper Clowers and the video exhibit, the Court makes the

following factual findings:

On the evening of April 7, 2020, while traveling on I-75 south in Anderson County,

Tennessee, THP Trooper Jeffrey Clowers was traveling behind a Nissan Sentra. He observed the

passenger tires of the Sentra cross over the fog line twice. Trooper Clowers matched the speed of

his patrol car to that of the Sentra for one-quarter of a mile and determined that the Sentra was

---

[7] Neither party presented any part of Deputy Laxton's in-car video at the December 7, 2020 hearing. On the recording, the view of the Sentra is mostly blocked by Trooper Clowers's patrol car, which is a Sport Utility Vehicle, and the recording has no audio.

16

going seventy-five miles per hour in a sixty-five-mile-per-hour zone. While pacing the Sentra, Trooper Clowers called in the license tag number to the dispatcher. The trooper then activated his blue lights and stopped the Sentra at 10:16 p.m., Eastern Daylight Time ("EDT").[8]

Trooper Clowers walked to the open, front passenger's side window of the Sentra and immediately smelled an odor, which he recognized as raw marijuana, coming from inside the car. Three people occupied the Sentra: Breanna Garth was in the driver's seat, Anthony Brown was in the front passenger seat, and Donavon Ruffin was in the backseat, behind Garth. Trooper Clowers told the driver that he stopped the car for speeding and failure to maintain a lane and asked for Garth's driver's license. Trooper Clowers then asked Garth to get out of the car and meet him at the trunk. Trooper Clowers called for a check of Garth's driver's license and, while awaiting those results, he asked Garth where she was headed. Garth said she was going to stay with her mother for two weeks, but she was not able to give her mother's address. Trooper Clowers asked Garth if she would consent to a search of the car, but she responded by asking why he wanted to search, when she had provided her driver's license and insurance. The dispatcher reported that Garth's driver's license was suspended.

Leaving Garth standing behind the Sentra, Trooper Clowers again walked to the passenger's side window and asked Brown to retrieve the car's registration. Trooper Clowers asked Brown about the purpose of the trip. Brown told Trooper Clowers that they were traveling from Detroit, Michigan, to Texas Drive, Street, or Avenue in Knoxville, Tennessee, to take Garth's daughter to the hospital. Brown said that Garth's daughter was ill and that after they took her to the hospital, they would return to Detroit. Trooper Clowers then called for a back-up officer to come to the stop. Trooper Clowers asked Garth if the car contained marijuana. Garth denied there

---

[8] The Court takes judicial notice of the fact that Daylight Savings Time began on March 8, 2020.

17

was any marijuana in the car.  At some point after stopping the Sentra and before the back-up officer arrived, Trooper Clowers learned that the Sentra was a rental vehicle.  Garth told Trooper Clowers that her aunt had rented the vehicle.

Approximately seven minutes after Trooper Clower's stopped the Sentra, Deputy Laxton, of the Anderson County Sheriff's Department ("ACSD") arrived on the scene of the stop and parked behind Trooper Clowers.  Trooper Clowers had Ruffin get out of the car and talked with him behind his patrol car for five minutes.  Ruffin told him that Garth was Brown's girlfriend, and, like Brown, Ruffin said the group was traveling from Detroit to Knoxville to take a young woman to the hospital.  At some point after Deputy Laxton arrived, he pointed out a prescription medication bottle on the backseat of the Sentra, partially obscured by a duffle bag.  Trooper Clowers asked Brown about the medication bottle.  Brown said that the bottle contained cough syrup, that he had purchased the cough syrup "off the street," and that they had been mixing the cough syrup with another drink and "sipping it."

Approximately thirty-three minutes after Deputy Laxton arrived on the scene, the officers searched the car.  The officers found marijuana shake in an amount too small to collect in the carpet on the front passenger's side floorboard.  In the trunk, the officers found two duffle bags— one with male clothing and one with female clothing.  The officers also found a grocery bag with eight pounds methamphetamine, separated into eight packages, at the back of the trunk against the wall to the passenger's compartment.  After the search, Trooper Clowers learned that Ruffin had rented the Sentra.

## IV.    ANALYSIS

The Defendants contend that their Fourth Amendment rights were violated, because Trooper Clowers lacked probable cause to stop them for a traffic violation, searched the car without probable cause, and unlawfully detained them beyond the time necessary to issue a traffic citation. Defendants Brown and Ruffin also assert that the Indictment must be dismissed, because the Government cannot prove that they constructively possessed the methamphetamine in the trunk. The Court examines each of these issues in turn

### A. Propriety of Stop and Search

Fourth Amendment protects citizens against unreasonable searches or seizures.   U.S. Const. amend IV.   The Defendants contend that Trooper Clowers violated their rights under the Fourth Amendment by (1) stopping them without probable cause to believe they committed a traffic violation, (2) searching the Sentra without probable cause, and (3) detaining them beyond the time necessary to issue a traffic ticket.

#### (1) Probable Cause for Traffic Stop

Trooper Clowers testified that he stopped the Sentra after observing traffic violations.  If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment."   *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994).  Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388; *see Wren v. United States*, 517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is

19

reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct"). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). A stop based on probable cause that a traffic violation has occurred is reasonable, without regard to the subjective motives of the officer. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 391.

The Government contends that Trooper Clowers had probable cause to stop the Sentra for speeding and failure to maintain a lane. It asserts that Trooper Clowers observed the tires of the Sentra cross over the fog line twice and paced the Sentra while traveling at seventy-five (75) miles per hour for one-quarter mile. The Defendants argue that the Sentra's slight shifts over the fog line did not endanger other drivers and that Trooper Clowers's testimony that the Sentra was exceeding the speed limit is not credible. They assert that pacing is not a reliable method for determining speed when performed for a short distance, such as one-quarter mile.

Under Tennessee law, when a road is divided into two or more lanes, a "vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety[.]" Tenn. Code Ann. § 55-8-123(1). Trooper Clowers testified that the entire tire of the Sentra crossed over the fog line twice within the space of one-quarter mile [Tr. at 8, 18, & 21]. Defendants object that this

20

does not constitute a violation of § 55-8-123(a), because the Sentra was not endangering other traffic, as no other traffic was around.

Our appellate Court has held that a single instance of crossing the lane line does not amount to a violation of § 55-8-123(1). *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). However, in this case, the Court finds, based upon Trooper Clowers's testimony, that the Sentra crossed the fog line twice. *See United States v. Howton*, 260 F. App'x 813, 816 (6th Cir.) (affirming probable cause for traffic stop when officer observed vehicle cross over lane marker onto shoulder twice by nearly a foot in violation of similarly worded Kentucky statute), *cert. denied,* 554 U.S. 908 (2008). Additionally, given the absence of traffic or reported adverse weather conditions at the time, there does not appear to be a reason for the Sentra's failure to maintain its lane. *See United States v. Howard*, No. 3:18-CR-29-TAV-HBG, 2018 WL 6061439, *4 (E.D. Tenn. Nov. 20, 2018) (observing the lack of heavy traffic or high winds and the straight stretch of highway reveal no "good reason" for defendant to fail to keep his car within his lane), *affirmed by* 815 F. App'x 69 (6th Cir. 2020). Finally, with regard to Defendants' argument that the brief breach of the fog line did not endanger other motorists, the Court finds that Trooper Clowers was traveling two hundred yards behind the Sentra, as it crossed outside of the lane in the dark while traveling at a high rate of speed [Tr. at 18-20]. Accordingly, the Court finds that Trooper Clowers had probable cause to stop the Sentra for failure to maintain its lane in violation of § 55-8-123(1).

The Government also contends that Trooper Clowers had probable cause to stop the Sentra for speeding. Trooper Clowers testified that he followed the Sentra for one-quarter of a mile, while pacing it, and determined that the Sentra was traveling at seventy-five miles per hour in a sixty-five-mile-per-hour zone. The Defendants argue that Trooper Clowers did not pace the Sentra for a sufficient length of time to determine its speed reliably.

In order to determine a vehicle's speed by pacing, the officer must travel at a constant distance from the subject vehicle for a length of time. *United States v. Carter*, 662 F. App'x 342, 344 n.1 (6th Cir. 2016) (affirming trial court's finding that trooper had probable cause to stop defendant for speeding based on testimony of laser device reading and pacing). Pacing allows the officer to determine the subject vehicle's speed by using his or her own speed. In *United States v. Whaley*, this Court upheld an officer's probable cause determination, based upon pacing, when the officer had a "considerable opportunity" to observe the defendant's driving, as he matched the defendant's speed, which exceeded the speed limit by fifteen miles per hour. No. 1:04-CR-122, 2005 WL 8168971, *2 (E.D. Tenn. Jan. 11, 2005) (observing the officer testified that the speedometer of his unmarked police car was periodically checked with radar). In contrast, the undersigned has previously found an officer's pacing did not provide probable cause, when the trooper admitted that "true" and "accurate" pacing required following the vehicle for two tenths of a mile, which he did not do. *United States v. Wanda Hayes & Patrick Carney*, No. 3:19-CR-73-TAV-HBG, 2020 WL 4034309, *11 (E.D. Tenn. Feb. 21, 2020) (Report & Recommendation), *adopted by* 458 F. Supp. 3d 857 (E.D. Tenn Apr. 28, 2020) (Varlan, D.J.).

In the instant case, Trooper Clowers testified that he followed the Sentra, matching its speed, for one-quarter mile, which is slightly longer than the trooper in the *Hayes and Carney* case stated would be sufficient to pace a vehicle accurately. Moreover, although Trooper Clowers did not corroborate his pacing with his radar, he consistently testified that he told the driver that he stopped the Sentra for failure to maintain a lane and speeding. The Court finds that nothing in the record before it contradicts Trooper Clowers's testimony that the Sentra was speeding. *See United States v. Garrido-Santana*, 360 F.3d 565, 571-72 (6th Cir.) (affirming trial court's finding that officer was credible when only evidence contradicting officer's testimony that he paced

defendant's car at six miles over the speed limit was defendant's own self-serving testimony), *cert. denied* 542 U.S. 945 (2004). Accordingly, the Court finds that Trooper Clowers had probable cause to believe the Sentra was traveling at ten miles per hour over the speed limit, which provides an additional basis to stop the Sentra.

Assuming for the sake of argument that Trooper Clowers's observations of the Sentra crossing over the fog line and speeding did not amount to probable cause, the Court also finds he at least had reasonable suspicion to conduct an investigatory stop of the Sentra based upon his observations of the vehicle crossing over the lane and speeding. Our appellate court has held that an officer may stop someone for a completed misdemeanor, if the officer has reasonable suspicion to believe the individual committed the crime and the stop furthers public safety, considering the nature and timing of the crime. *United States v. Jones*, 953 F.3d 433, 437-38 (6th Cir.), *cert. denied* 141 S. Ct. 437 (2020) (observing the court must balance the security and liberty interests involved in stop for a completed misdemeanor on less than probable cause); *see also Howard*, 815 F. App'x at 73 n.1 (noting with regard to a traffic violation that "reasonable suspicion of a completed misdemeanor may in some circumstances justify an investigatory stop"). The Sixth Circuit approved the "facts-and-circumstances test" from *United States v. Hensley*, 469 U.S. 221, 226 (1985), which examines (1) the nature of the crime, (2) how long ago the individual committed the crime, and (3) whether the individual presents an ongoing risk to public safety and added the following additional factors: (4) if the Government has a strong interest in solving the crime and/or apprehending the perpetrator, and (5) whether waiting until the officer has probable cause will allow the perpetrator to flee. *Jones*, 953 F.3d at 437-38.

In the instant case, the *Hensley* factors support a finding that Trooper Clowers properly stopped the Sentra. The Sentra crossed significantly over the fog line twice in a short time, while

traveling at a high rate of speed at night. Trooper Clowers stopped the Sentra after following it for about one mile and, thus, near in time to its crossing over the fog line. The Sentra's erratic movements at night on a public highway presented a potential threat to other motorists. The Court further finds that the state has a strong interest in protecting the safety of motorists and that Trooper Clowers's continuing to follow the Sentra to observe other traffic violations, beyond speeding and failure to maintain its lane, could potentially endanger other motorists as well as the occupants of the Sentra. Thus, if Trooper Clowers's observations of the Sentra crossing over the fog line and speeding did not amount to probable cause, they at least provide reasonable suspicion for Trooper Clowers to stop the Sentra and continue his investigation into the erratic driving he observed. Accordingly, the Court finds the stop of the Sentra did not violate the Fourth Amendment.

### (2) Probable Cause to Search the Vehicle

Defendants next argue that Trooper Clowers did not have probable cause to conduct a warrantless search of their vehicle. Trooper Clowers testified that immediately upon arriving at the Sentra's open window, he smelled the odor of raw marijuana coming from inside the car. The Government asserts that Trooper Clowers's detection of the odor of marijuana gave him probable cause to search the Sentra pursuant to the automobile exception to the Fourth Amendment's warrant requirement.

It is well-settled that an officer may conduct a warrantless search of an automobile if the officer has probable cause to believe it contains contraband or evidence of criminal activity. *Carroll v. United States*, 267 U.S. 132, 153, 159 (1925); *see also Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018) (discussing evolution of automobile exception). This exception to the warrant requirement of the Fourth Amendment stems from the automobile's ready mobility and pervasive regulation. *Collins*, 138 S. Ct. at 1669-70; *United States v. Keeling*, 783 F. App'x 517, 523 (6th

24

Cir. 2019). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Our appellate court has held that an officer's detection of the odor of marijuana from a vehicle provides probable cause to search the vehicle. *United States v. Foster*, 376 F.3d 577, 588 (6th Cir.), *cert. denied*, 543 U.S. 1012 (2004). In this regard, the officer need not have any other suspicion or information, because "the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle." *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (collecting cases).

The Court finds that Trooper Clowers had probable cause to search the Sentra based upon his detection of the odor of raw marijuana when he came to the car's open window. The Defendants raise two challenges to this probable cause finding: (1) that Trooper Clowers's testimony that he smelled the odor of raw marijuana is not credible and (2) that the odor of marijuana is no longer sufficient to establish probable cause when legal substances such as hemp have the same odor. Neither of these arguments persuade the Court to depart from it's probable cause finding.

First, the Court finds Trooper Clowers's testimony that he smelled marijuana upon arriving at the Sentra's window to be credible. Trooper Clowers testified he is familiar with the odor of marijuana and can distinguish between the odor of raw marijuana and burnt marijuana [Tr. at 9, 23]. He also testified that he asked Garth about marijuana in the car, which she denied [Tr. at 36-37]. The Court finds this testimony is consistent with and supports Trooper Clowers's testimony regarding the odor of marijuana coming from the car. Defendants presented no evidence that marijuana flakes on the passenger's floorboard cannot produce sufficient odor to be detected from a car window. Instead, they simply argue that it defies belief. This argument does not undermine

25

Trooper Clowers's credibility, particularly given the consistency of this testimony with his question to Garth about the presence of marijuana in the car. *See United States v. Vaughn*, 429 F. Supp. 3d 499, 509 (E.D. Tenn. 2019) (Collier, D.J.) (examining defendants' unsupported argument that officers' detection of the odor of marijuana at the door of an apartment "defies logic" given the small amount of marijuana found).

Second, the Court is not persuaded by the Defendants' argument that the legalization of substances such as hemp or CBD eliminate the probable cause from an officer detecting the odor of marijuana. As an initial matter, the Court observes that the record contains scant, if any, evidence that the odor of marijuana is similar to that of hemp. Trooper Clowers testified he had heard the odor of hemp resembled the odor of marijuana, but he had no personal experience with the odor of hemp. Moreover, the case law in this district addressing this precise argument (that the legalization of hemp eliminates probable cause from the odor of marijuana) rejects it. *Vaughn*, 429 F. Supp. 3d at 510.

In *Vaughn*, the Court found probable cause for the issuance of a search warrant based in part upon the officers smelling the odor of marijuana when the defendants' apartment door was opened. *Id.* at 509. The defendants argued that the odor the officers detected could have been hemp. *Id.* The court noted that probable cause "requires 'a fair probability, given the totality of the circumstances, that contraband or evidence will be found in a particular place.'" *Id.* (quoting *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)). The court reasoned:

> Absolute certainty is not required [for probable cause]. *See id.* As a result, Defendants' contention that the smell could have been hemp does not change the fact that it also could be, and was, marijuana. The officers' detection of a marijuana odor meant there was a fair probability that marijuana would be found within the apartment, which is sufficient for probable cause.

*Id*.  The undersigned finds the same analysis applies to Trooper Clowers's detection of the odor of marijuana in this case.  Trooper Clowers, a trained officer, testified that he is familiar with the odor of marijuana.  His detection of this odor at the window of the Sentra meant there is a fair probability that the car contained marijuana.

Finally, the Defendants ask the Court to consider the fact that state law permits the possession of hemp and/or CBD with a concentration of .3 percent or less of THC.[9]  At the reopened evidentiary hearing, Mr. Brinkman argued that the Court should take into consideration the way that state law on marijuana and hemp is evolving.  However, the possession of marijuana remains illegal under federal law.  *Gonzalez v. Raich*, 545 U.S. 1, 27 (2005) (observing that the Controlled Substances Act "designates marijuana as contraband for any purpose").  State laws legalizing marijuana or some part of the marijuana plant do not preempt federal law.  *United States v. Hicks*, 722 F. Supp. 2d 829, 833 (E.D. Mich. 2010) (holding that "[i]t is indisputable that state medical-marijuana laws do not, and cannot, supercede federal laws that criminalize the possession of marijuana"); *see also Young v. United States*, Nos. 4:06–cr–14, 4:10–cv–72, 2013 WL 4679931, *7 (E.D. Tenn. Aug. 30, 2013) (Edgar, J.) (observing that "[t]he manufacture, possession and distribution of marijuana, a Schedule I controlled substance, continues to be illegal under federal law for the entire United States of America, even if it is possessed for medical purposes in accordance with state laws").  Accordingly, the Court finds that Trooper Clowers's detection of the odor of marijuana upon his arrival at the open window of the Sentra provided probable cause for him to search the Sentra.

---

[9] In support of this premise, Defendant Garth cites to Tenn. Code Ann. § 43-27-101(3) [Doc. 72, p.5].  However, this statute merely defines hemp as used in Title 43, which governs the licensure and regulation of hemp producers.  Section 43-27-103(3) states the "[p]ossession of cannabis with THC concentrations greater than three-tenths of one percent (0.3%) on a dry weight basis" is prohibited in Tennessee.

27

*(3) Duration of Detention*

The Defendants also argue that Trooper Clowers violated their rights under the Fourth Amendment, when he detained them beyond the time necessary to issue a traffic citation. They maintain that within four minutes of stopping the Sentra, Trooper Clowers had all the information he needed to prepare a citation for driving on an invalid license and any traffic violations. Discounting the trooper's detection of the odor of marijuana, they argue that Trooper Clowers unreasonably detained them beyond the time necessary for him to determine that Ruffin possessed a valid driver's license and write a citation or citations. They assert that after Trooper Clowers completed those two tasks, he should have permitted them to leave. The Government argues that Trooper Clowers already had probable cause to search the Sentra based upon the odor of marijuana and that during the time he awaited the arrival of additional officers, the Defendants' inconsistent stories and Defendant Brown's admission regarding a bottle of cough syrup increased Trooper Clowers's suspicion of illegal activity. For the reasons discussed below, the Court finds the length of the detention did not violate the Fourth Amendment.

"[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop).

A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied,* 528 U.S. 1176 (2000). In the instant case, before the traffic stop was completed, indeed, as it began, Trooper Clowers had probable cause to search the Sentra based upon the odor of marijuana from inside the car. However, the Court examines whether the detention of the Defendants until the search of the Sentra was reasonable.

Based upon the testimony of Trooper Clowers and the video introduced at the reopened suppression hearing, the Court finds the Defendants were detained approximately forty minutes from the time Trooper Clowers stopped the Sentra until he searched it. Trooper Clowers stopped the Sentra around 10:16 p.m. EDT,[10] and smelled the odor of marijuana as soon as he walked up to the passenger's side of the vehicle and the window was lowered. At this point, Trooper Clowers

---

[10] Defendant Ruffin argues that Trooper Clowers detained them for more than an hour, based upon the trooper's initial testimony that he stopped the Sentra at 9:15 p.m., and the video depicting Deputy Laxton's arrival around 10:35 p.m. However, the Court credits Trooper Clowers's testimony at the reopened evidentiary hearing that he stopped the Sentra at 10:16 p.m. EDT and that his earlier testimony of 9:15 p.m. was mistaken. Trooper Clowers testified that he gave two times in his report on the stop in this case: 10:16 p.m., Eastern Time, and 21:16 or 9:16 p,m, Central Time. He said that CAD system in this patrol car is on Central Time, which could be the reason for him stating that he conducted the stop at 9:16 p.m., Central Time, in the narrative of his report. He also testified that he was positive about the time of the stop being 10:16 p.m., Eastern Time. The Court finds the video reveals that Deputy Laxton arrived at the scene of the traffic stop at 10:23 p.m. Accordingly, the Court finds that Trooper Clowers detained the Defendants for approximately seven minutes before Deputy Laxton arrived. This is consistent with Trooper Clowers's testimony that Deputy Laxton arrived around ten minutes after he stopped the Sentra.

had probable cause to search the Sentra.  However, Trooper Clowers proceeded with the traffic stop, requesting Garth's driver's license and asking her to talk with him outside of the car.

Within minutes of stopping the Sentra, Trooper Conners learned that Garth had an invalid driver's license, and Garth and Brown gave inconsistent stories about their destination and purpose of travel.[11]  Trooper Clowers testified that he decided to search the car, based upon the marijuana odor and the inconsistent stories, and called for a backup officer to report to the scene.  Trooper Clowers testified that his department requires two officers to be present for a search and that he wanted another officer on the scene, because there were three occupants in the car.  While awaiting the arrival of the back-up officer, Trooper Clowers asked Defendant Garth whether the Sentra contained marijuana, which she denied.

---

[11] The Defendants argue that the accounts of the purpose of the trip are not necessarily inconsistent. Trooper Clowers testified that Garth said she was going to stay with her mother for two weeks, although she was not able to give the address.  He stated that Brown said they were going to Texas Street or Avenue to take Garth's daughter to the hospital, after which they would return to Detroit, Michigan.  However, the Court finds these two accounts describe stays of contrasting lengths and purposes and that Trooper Clowers could reasonably believe them to be inconsistent.

Defendant Ruffin also argues that all statements by the trio during the stop must be suppressed because Trooper Clowers did not advise them of the *Miranda* warnings.  Law enforcement officers must advise a person of the *Miranda* warnings, when the person is questioned while in police custody.  *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).  Although a traffic stop curtails the driver's and the passengers' freedom of movement, the Supreme Court has held that an individual briefly detained for a routine traffic stop "is not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984).  In so holding, the Court likened a traffic stop to a "*Terry*" stop" and observed that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440.  In the instant case, the Court finds that the Defendants were not in custody for purposes of *Miranda*, when they made statements about their destination and the cough syrup.  These topics were discussed while the Defendants were seated in the Sentra or standing just outside of it.  Although the video reveals that Defendants Brown and Ruffin were later handcuffed and likely seated in police cars, the statements in question were made before that occurred.

Deputy Laxton arrived at the scene of the traffic stop at 10:23 p.m., approximately three minutes after Trooper Clowers learned of Garth's invalid driver's license and seven minutes after the stop. Following Laxton's arrival, Trooper Clowers learned additional information that increased his suspicions of criminal activity. Deputy Laxton pointed out a what appeared to be a prescription bottle on the back seat. Trooper Clowers asked Brown about this bottle, and Brown said it contained cough syrup, which he had purchased "off the street." Brown said they were mixing the contents of the bottle with another drink and sipping it. Although Defendants argue that Trooper Clowers did not know whether the contents of the bottle, which Brown identified as cough syrup, was illegal to possess or consume, the Court finds that Brown's statements about where he purchased the cough syrup and the manner in which he was ingesting it could arouse suspicion in the trooper, particularly in light of the fact that the container appeared to be a prescription bottle.

Trooper Clowers began searching the Sentra about thirty minutes after Deputy Laxton's arrival. During the time prior to the search, Trooper Clowers talked with Ruffin outside of the Sentra, before handcuffing him and placing him in his patrol car. Deputy Laxton directed a handcuffed Brown away from the Sentra and presumably into his patrol car and directed Garth to stand in front of Trooper Clowers's patrol car. The search of the Sentra began about two and one-half minutes after the three occupants were removed from the Sentra.

An officer may require both the driver and the passengers to get out of the vehicle during a traffic stop for officer safety. *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997). In order to determine whether a warrantless seizure of an individual is warranted for officer safety, the Court must consider "whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. "'A concern for

officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, . . . and conducting pat down searches upon reasonable suspicion that they may be armed and dangerous.'" *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005)). The focus of the inquiry is whether the officers' conduct was reasonable "in light of the surrounding circumstances and their suspicions." *Id.*

In the instant case, the Court finds that detaining the Defendants for a brief time to permit other officers to arrive on the scene was reasonable.[12] Trooper Clowers stopped the Sentra at night and was outnumbered by the occupants. He could not have searched the Sentra and monitored the Defendants while he did so. A reasonably prudent officer in Trooper Clowers's position would be justified in believing his safety was at risk. The Court also finds that Trooper Clowers continued to investigate whether the Sentra contained illegal drugs while he awaited the arrival of other officers. He asked Garth about the presence of marijuana in the car, and he questioned Brown about a cough syrup bottle he saw through the window. Finally, the Court finds that removing the Defendants from the Sentra during the search was reasonable. *See e.g. Michigan v. Summers*, 452 U.S. 692, 705 (1981) (holding that detaining the occupants of a premises while executing a search warrant promotes officer safety). Accordingly, the undersigned finds that detaining the Defendants, first in the Sentra and later outside of the Sentra, for approximately thirty-three minutes to allow other officers to arrive on the scene and to effectuate the search of the Sentra was reasonable in duration and scope.

---

[12]The video suggests that other officers arrived on the scene about eighteen minutes after Deputy Laxton. Additionally, Trooper Clowers testified that Trooper Fletcher photographed the flakes of marijuana in the front passenger-side floorboard.

*(4) Conclusion*

Trooper Clowers properly stopped the Sentra for two traffic violations. Upon arriving at the open passenger-side window, Trooper Clowers immediately smelled the odor of marijuana, which gave him probable cause to search the car. Finally, the detention of the Defendants' for approximately thirty-three minutes to allow for the arrival of other officers, to continue the investigation, and for Defendants to be removed from the Sentra was reasonable. The Court recommends that the Defendants' joint Motion to Suppress [Doc. 61] should be denied.

**B. Sufficiency of Indictment**

Defendants Brown and Ruffin move the Court to dismiss the charges against them, because the Government will not be able to prove the charges at trial. Defendants Brown and Ruffin are charged with conspiring with each other, Defendant Garth, and unnamed others to possess with intent to distribute fifty grams or more of methamphetamine on April 6 through 7, 2020 (Count One) [Doc. 36]. They are also charged with possession of fifty grams or more of methamphetamine with intent to distribute on April 7, 2020 (Count Two) [Doc. 36]. Defendants Brown and Ruffin contend that taking the facts listed in the affidavit to the Criminal Complaint [Doc. 1] as true, the Government cannot prove they possessed methamphetamine found in the Sentra's trunk. They contend that the Government must prove that they had either direct physical control over the methamphetamine or that they constructively possessed it. They assert that constructive possession requires the individual exercise control of an item, either directly or through others. Defendants contend that their mere presence in the Sentra is insufficient as a matter of law to prove constructive possession.

Federal Rule Criminal Procedure 12(b)(3)(B)(v) provides that "a defect in the indictment," specifically the failure to state an offense, "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits[.]"  Moreover, the Court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). Resolution of a pretrial motion to dismiss the indictment for failure to state an offense is appropriate when the "facts surrounding the alleged offense [are] virtually undisputed and trial of the substantive charges would not substantially assist the court in deciding the legal issue raised by the motion to dismiss the indictment." *Id.* at 665.  In *Jones*, the appellate court held that the district court properly decided the defendant's motion to dismiss the indictment "because [the motion] raised the legal question of whether [the statute at issue] was intended to apply to interspousal wiretaps" and the facts relating to the issue were "virtually undisputed[.]" *Id.*; *see also United States v. Vertz*, 40 F. App'x 69, 71 (6th Cir. 2002) (stating that "where the defendant is arguing that as a matter of law the undisputed facts do not constitute the offense charged in the indictment, the [c]ourt is reviewing a question of law, not fact").

From the case law and Rule 12(b)(3)(B)(v), the Court distills two requirements for addressing a motion to dismiss the indictment which alleges that the government cannot establish the offense charged as a matter of law:  (1) the issue raised must be a question of law and (2) the relevant facts must be undisputed. *Jones*, 542 F.2d at 665; *see also United States v. Fitzgerald*, No. 1:16-cr-178, 2017 WL 74074, *2 (6th Cir. Jan. 9, 2017) (examining whether undisputed facts in the criminal complaint constituted operating an airplane while under the influence of alcohol as a matter of law).  The undisputed nature of the evidence is an important predicate to a court's

determination of a motion to dismiss the indictment. If the evidence relating to the issue raised by the parties is disputed, the court runs the risk of treading upon the role of the grand jury:

> When a body of citizens, properly chosen and constituted as a grand jury, finds probable cause to believe that a crime has been committed within its jurisdiction, that finding is sufficient to require a trial. The indictment is not evidence, as every petit jury in a criminal case is instructed. The prosecution must still produce evidence from which the trial jury can find every element of the offense proven beyond a reasonable doubt, or the defendant is entitled to a judgment of acquittal. However, the prosecution's evidence is tested at trial, not in a preliminary proceeding.

*United States v. Short*, 671 F.2d 178, 183 (1982); *see also United States v. Levin*, 973 F.2d 463, 472 (6th Cir. 1992) (Boyce, J., dissenting) (decrying "the district court's pre-trial decision that the government would not be able to establish the requisite criminal intent at trial [as being], in essence, a decision that the indictment was based on insufficient or inadequate evidence").

In the instant case, the Defendants contend that based upon the facts the Government alleges in the affidavit supporting the Criminal Complaint, they did not actually or constructively possess the methamphetamine found in the trunk of the Sentra. In order to prove that Defendants possessed methamphetamine with intent to distribute as alleged in Count Two,[13] the Government must "prove knowing possession—actual, constructive, or joint—with intent to distribute." *United States v. Paige*, 470 F.3d 603, 609 (6th Cir. 2006). Constructive possession occurs "'when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *United States v. Alonzo*, 811 F. App'x 301, 304-05 (6th Cir. 2020) (quoting *United States v. Kincaide*, 145

---

[13] As noted by the Government, the charge in Count One does not require that the Government prove possession but, instead, it must prove that the Defendants knowingly joined in the criminal agreement. *See United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006), *cert. denied,* 549 U.S. 1326 & 1353 (2007).

35

F.3d 771, 782 (6th Cir. 1998)).  Constructive possession may be proven by direct or circumstantial evidence.  *Id.*

The undersigned agrees with the Government that the Defendants raise an issue of fact, rather than one of law.  Constructive possession of controlled substances cannot be proven beyond a reasonable doubt from the defendant's "mere presence" at the location where the drugs are found. *United States v. Welch*, 97 F.3d 142, 150 (6th Cir. 1996).   Defendants Brown and Ruffin argue that the only evidence in the affidavit to the Criminal Complaint of their possession of the methamphetamine is their presence in the Sentra.  However, the Government is not limited to the allegations in that affidavit for its proof at trial.  The Government argues that it has a "host of circumstantial evidence that these defendants constructively and jointly possessed, or aided and abetted the possession" of methamphetamine [Doc. 65, p.5].  For example, it states Defendant Brown's duffel bag was found in the Sentra's trunk next to the methamphetamine and that Defendant Ruffin rented the Sentra the day before the stop.  It also contends that a law enforcement expert will testify that drug trafficking organizations often send more than one person with a large shipment of drugs in order to ensure that the drugs and cash proceeds are not stolen and a drug trafficking organization will send trusted men to protect a drug shipment.[14]  Thus, the Government intends to present additional evidence beyond the information alleged in the affidavit to the Criminal Complaint.

Rule 12(b)(3)(B)(v) motions are only appropriate if they can be resolved "without a trial on the merits[.]"  Whether the Government can prove that Defendants Brown and Ruffin possessed the methamphetamine in the trunk of the Sentra is a question of *fact*, and not solely a question of

---

[14] The Government also argues that it may prove Defendants Brown and Ruffin aided and abetted others with regard to Count Two.

law, and, as such, it is reserved to the jury.  The undersigned recommends that the Defendants'

Motion to Dismiss Indictment [Doc. 59] be denied.

## V.      CONCLUSION

After carefully considering the parties' filings and arguments, the evidence, and the

relevant legal authorities, the Court finds Trooper Clowers properly seized the Defendants for a

traffic stop.  The Court finds Trooper Clowers properly searched the Defendants' vehicle pursuant

to the automobile exception to the warrant requirement and that the length of time the Defendants

were detained until the car was searched was reasonable.  The Court also finds that contested issues

of fact exist with regard to whether Defendants Brown and Ruffin constructively possessed the

methamphetamine in the trunk of the Sentra.   Accordingly, the undersigned respectfully

**RECOMMENDS** that Defendants Brown and Ruffin's Motion to Dismiss Indictment [**Doc. 59**]

and the Defendants' joint Motion to Suppress [**Doc. 61**] be denied.[15]

Respectfully submitted,

United States Magistrate Judge

---

[15] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).